**SIGNED THIS: January 3, 2018**

_____
**Mary P. Gorman
United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In Re ) | |
| ) | Case No. 12-72022 |
| THR & ASSOCIATES, INC., ) | |
| ) | Chapter 7 |
| Debtor. ) | |
| _____ ) | |
| ) | |
| In Re ) | |
| ) | Case No. 15-90801 |
| ALDO CARMEN RUFFOLO and ) | |
| JULIE LYNN RUFFOLO, ) | Chapter 7 |
| ) | |
| Debtors. ) | |

## O P I N I O N

Before the Court are applications for compensation of an auctioneer hired by the Chapter 7 Trustee in each of the above-captioned cases. Because one of the applications references receipt by the auctioneer of compensation not disclosed when the auctioneer was employed and both applications fail to fully

disclose all compensation paid or promised to the auctioneer for the sale of estate assets, both applications will be denied without prejudice.

## I. Factual and Procedural Background

Because the same legal issues were raised in each of these cases, they have been consolidated for the purpose of this Opinion. The posture of the Trustee's application in each case is different, however, and the facts of each case are therefore set forth separately.

### *A. Aldo and Julie Ruffolo*

Aldo and Julie Ruffolo filed their voluntary Chapter 7 petition on July 27, 2015. On April 25, 2017, Jeffrey D. Richardson, the Chapter 7 Trustee ("Trustee"), filed his Amended Application to Employ Martin Auction Services, LLC ("Application to Employ"), to sell the Ruffolos' 2009 GMC Yukon Denali. In the Application to Employ, the Trustee proposed paying Martin Auction Services, LLC ("Martin Auction") a 5% commission on the auction sale price plus any transporting fee for bringing the vehicle to the auction site. The Application to Employ also stated that Martin Auction "charges a buyer's premium of 5% for all auctions other than for the sale of agricultural equipment." The Application to Employ further stated that all sale funds would be turned over to the Trustee and that all fees and costs of the auctioneer would be subject to court approval. Finally, in the Application to Employ, the Trustee represented that he believed that Martin Auction did not hold or represent any interest adverse to the

bankruptcy estate. A verified statement of disinterest signed by a representative of Martin Auction was attached to the Application to Employ. On May 10, 2017, the Court entered its order allowing the Application to Employ, which specifically provided that all fees and expenses were subject to court approval.

On September 14, 2017, the Trustee filed his Amended Application to Pay Auctioneer ("Application to Pay"). According to the Application to Pay, Martin Auction had sold the Ruffolos' 2009 GMC Yukon Denali at public auction for $11,000. Based on the 5% commission disclosed in the Application to Employ, the Application to Pay asked the Court to approve compensation for Martin Auction in the amount of $550 plus $132.90 in expenses. In the Application to Pay, the Trustee also stated that he was "informed that the auctioneer also charged a 'buyer's premium' to the buyer of the vehicle, no portion of which was charged to or paid by the bankruptcy estate." The amount charged for the buyer's premium was not disclosed, and the Application to Pay did not request approval of the buyer's premium.

On October 16, 2017, this Court entered an order giving the Trustee an opportunity to file a memorandum of law regarding authority for the proposition that the amount charged as a "buyer's premium" is not subject to court approval, need not be disclosed, and is not property of the estate. The Trustee was also asked to explain how the retention by the auctioneer of the amount charged as a "buyer's premium" without being fully disclosed and approved by the Court is not a breach of the Trustee's and the auctioneer's fiduciary obligations to the estate. The Trustee timely filed his Memorandum of Law.

*B. THR & Associates, Inc.*

THR & Associates, Inc. ("THR"), filed its voluntary Chapter 7 petition on September 12, 2012. On March 7, 2013, the Trustee filed an Application to Employ Auctioneer ("Application to Employ"), proposing to hire Martin Auction to sell an unknown number of THR's motor vehicles and trailers. The Application to Employ proposed paying Martin Auction a 5% commission on the auction sale price plus any transporting fees for bringing the vehicles to the auction site. No other compensation was disclosed. The Application to Employ stated that all sale funds would be turned over to the Trustee and that all fees and costs of the auctioneer would be subject to court approval. The Trustee represented that he believed that Martin Auction did not hold or represent any interest adverse to the bankruptcy estate, and a verified statement of disinterest signed by a representative of Martin Auction was attached to the Application to Employ. On March 22, 2013, the Court entered its order allowing the Application to Employ, which specifically provided that all fees and expenses were subject to court approval.

On September 13, 2017, the Trustee filed his Application to Pay Auctioneer ("Application to Pay"), seeking approval of compensation for Martin Auction for the sale of a 2001 Chevrolet Suburban at public auction for $750. Specifically, the Application sought approval of a 5% commission of $37.50, as well as towing and repair expenses of $289. In addition, however, the Application to Pay stated that the Trustee was "informed that the auctioneer also charged a 'buyer's premium' to the buyer of the vehicle, no portion of which was charged to or paid

-4-

by the bankruptcy estate." The amount charged for the buyer's premium was not disclosed, and the Application to Pay did not request approval of the buyer's premium.

On October 18, 2017, this Court entered an order noting the same concerns raised in the *Ruffolo* case and giving the Trustee an opportunity to file a memorandum of law to address the additional issue of how a buyer's premium could be charged and retained by an auctioneer when the charge was neither disclosed nor approved in the original employment process. The Trustee filed a response to the Court's order, stating that he had conferred with Martin Auction, and, due to his own error in not including the buyer's premium in the Application to Employ, he and Martin Auction agree that there is no basis to charge or retain the amount charged as a buyer's premium. According to the Trustee, Martin Auction has refunded the buyer's premium to the buyer.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Matters concerning the administration of the bankruptcy estate are core proceedings. 28 U.S.C. §157(b)(2)(A). These matters arise from the Debtors' bankruptcies themselves and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### III. Legal Analysis

*A. Buyer's Premiums*

Over the last several years, the charging of a "buyer's premium" has become a common tool used by auctioneers in the American auction industry. *In re Driller,* 2004 WL 1661981, at *3 (Bankr. D. Idaho July 7, 2004). A buyer's premium is essentially an additional fee charged to the successful bidder at an auction. *Id.* at *1. This fee, generally calculated as a percentage of the final sales price, is paid to the auctioneer by the buyer and is in addition to the commission charged to the seller. *Id.* And while the charging of buyer's premiums has become increasingly common, the use and impact of the buyer's premium in auctions is still a subject of debate and confusion, even within the industry. *Id.* at *4. Whether allowing such premiums to be charged in bankruptcy sales is a "good idea" remains an open question. *Id.*

Trustees in the Central District of Illinois began routinely filing applications to employ auctioneers that disclosed the additional charge of a buyer's premium approximately two years ago. Prior to that time, auctioneers hired by Chapter 7 trustees to sell vehicles and other personal property generally charged sales commissions in the range of 5% to 12.5%.[1] With the addition of buyer's premiums ranging from 5% to 10%, the gross commission generally charged on the sale of personal property has increased to a range of 10% to

---

[1] Some auctioneers also require the payment of a flat-fee amount as alternate compensation in the event their percentage compensation does not reach a minimum amount. Auctioneers also vary in what expenses are charged separately as out-of-pocket costs. Some auctioneers generally charge all expenses separately, including advertising and storage, resulting in much higher total costs to bankruptcy estates than when auctioneers who include such expenses in their commission conduct estate auctions.

22.5%. This Court has raised questions from time to time about the buyer's premiums being charged and has expressed concern about the doubling, and in some cases tripling, of the amounts being paid to auctioneers from estate sales. In response to the Court's questions, local trustees have expressed no concern over the practice and have generally suggested that buyer's premiums have no impact on the net sales proceeds received by the bankruptcy estates. Here, however, the conduct of Martin Auction and the Trustee raises serious concerns about their compliance with the mandates of the Code and Rules. Regardless of whether hiring auctioneers who charge buyer's premiums is a wise choice, trustees and auctioneers cannot ignore the requirements of the Code and Rules related to the employment and compensation of professionals.

*B. Employment of Professionals*

The employment of professionals, including auctioneers, by a case trustee must be approved by the court. 11 U.S.C. §327(a). And only professionals "that do not hold or represent an interest adverse to the estate, and that are disinterested persons," may be employed "to represent or assist the trustee in carrying out the trustee's duties under this title." *Id.* Federal Rule of Bankruptcy Procedure 2014(a) provides that the employment of professionals under §327 may only be approved on application of the trustee stating, among other things, "any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, [or] any other party in interest[.]" Fed. R. Bankr. P. 2014(a). The application must be

accompanied by a verified statement of the person to be employed, setting forth the person's connections to such parties in interest. *Id.*

In his response filed in *THR*, the Trustee did not argue that there is any authority for an auctioneer to charge and retain a buyer's premium that was not disclosed in the original application to employ. Rather, the cases discussing buyer's premiums cited by the Trustee make clear that, if an auctioneer intends to charge a buyer's premium, it must be disclosed as a term of employment and approved by the court. *See In re Carpenter*, 392 B.R. 97, 107 (Bankr. D. Vt. 2008); *Driller*, 2004 WL 1661981, at *2; *see also In re Deliverance Christian Church*, 2013 WL 5954686, at *4 (Bankr. N.D. Ohio Nov. 6, 2013) ("A buyer's premium is a material term that must be explicitly included in the [Chapter 11 sale] order if it is desired to be in effect."); *In re Remote Operating Systems, Inc.*, 238 B.R. 656, 658, 660 (Bankr. N.D. Tex. 1999) (noting that guidelines issued by the Office of the United States Trustee require disclosure and specific court approval at the time of employment for an auctioneer to charge a buyer's premium).

Bankruptcy courts have the authority and the responsibility, independent of any objection, to approve employment only of those professionals who meet the minimum requirements set forth in the Code and Rules. *In re Interwest Business Equip., Inc.*, 23 F.3d 311, 317 (10th Cir. 1994) (citing *In re Granite Sheet Metal Works, Inc.*, 159 B.R. 840, 846 (Bankr. S.D. Ill. 1993)). That determination, however, is dependent on full and complete disclosure of the information required under §327 and Rule 2014.

One of the prerequisites to being employed as a professional under §327 is that the professional "not hold or represent an interest adverse to the estate[.]" 11 U.S.C. §327(a). Although not specifically defined by the Code, an "adverse interest" has been described as one "that would tend to lessen the value of the bankruptcy estate." *In re Crivello*, 134 F.3d 831, 835 (7th Cir. 1998) (quoting *In re Roberts*, 46 B.R. 815, 827 (Bankr. D. Utah 1985)). If auctioneers, or any other professionals employed by a trustee, were free to make undisclosed compensation arrangements with third parties related to the work that they were doing for the bankruptcy estate, then it would be impossible to police the requirement that such professionals have no interests adverse to the estate. Strong policy considerations support strict compliance with the disclosure requirements of the Code and Rules, and the Trustee has made no compelling argument otherwise.

Rule 2014 also provides that the application for employment must disclose "any proposed arrangement for compensation[.]" Fed. R. Bankr. P. 2014(a). The rule is applied literally, and it draws no distinction between the source or application of payments. *In re Park-Helena Corp.*, 63 F.3d 877, 881-82 (9th Cir. 1995). Inclusion of a buyer's premium as a term of employment, and the details of the arrangement, must therefore be disclosed. *Driller*, 2004 WL 1661981, at *2. The necessity of complete disclosure of compensation arrangements when seeking employment of auctioneers is bolstered by Rule 6005, which provides that the "order of the court approving the employment of an appraiser or auctioneer shall fix the amount or rate of compensation." Fed. R. Bankr. P. 6005;

*see also Carpenter*, 392 B.R. at 107. It therefore follows that the rate of compensation set forth in the order approving employment binds the auctioneer and the trustee, and the charging of additional compensation, regardless of the payment source, is not permissible.

"The disclosure rules are applied literally," and this is true "even if the results are sometimes harsh." *Park-Helena Corp.*, 63 F.3d at 881 (citing *In re Plaza Hotel Corp.*, 111 B.R. 882, 883 (Bankr. E.D. Cal. 1990), *aff'd*, 123 B.R. 466 (9th Cir. BAP 1990)). Here, the intent of Martin Auction to charge a buyer's premium was not disclosed in the *THR* Application to Employ. "Payment of fees and expenses is premised upon compliance with court orders and benefit to the estate." *Deliverance Christian Church*, 2013 WL 5954686, at *4. Martin Auction was employed as auctioneer in *THR* at the rate of compensation proposed in its Application to Employ—"5% commission on the auction sale price plus any transporting fee[.]" Because the Application to Pay in *THR* discloses charges inconsistent with the terms of employment, it cannot be approved.

*C. Compensation of Professionals*

An award of fees to a professional employed under §327, is governed by §330, which provides that an award may be made for "reasonable compensation for actual, necessary services rendered by the . . . professional . . . and . . . reimbursement for actual, necessary expenses." 11 U.S.C. §330(a)(1). Section 330(a)(3) sets forth several, nonexclusive factors that are relevant to the determination of what constitutes "reasonable" fees. Those factors include: the

-10-

time spent and the rates charged for such services; whether the services were necessary or beneficial to the administration of the case; whether services performed were commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and whether the compensation is reasonable based on the customary compensation charged by comparably skilled professionals in nonbankruptcy cases. 11 U.S.C. §330(a)(3). Fees and expenses that are to be paid from the estate must be sought by filing an application detailing the services rendered and amounts requested that includes "a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case [and] the source of the compensation so paid or promised[.]" Fed. R. Bankr. P. 2016(a).

In arguing that Martin Auction was not required to disclose or seek approval of fees it collected from buyer's premiums, the Trustee asserted that such fees are not property of the estate and not subject to review. But the weight of authority holds that amounts charged, retained, or collected as a buyer's premium are property of the bankruptcy estate. *See Carpenter*, 392 B.R. at 104. Property of the estate is broadly defined as "all legal or equitable interests of the debtor in property as of the commencement of the case[,]" including "[p]roceeds . . . or profits of or from property of the estate[.]" 11 U.S.C. §541(a)(1), (6). And the term "proceeds" in the context of a bankruptcy sale is not used in a confining sense but is intended to encompass whatever is received, produced, or derived from or in exchange for property of the estate. *In re Rossmiller*, 82 F.3d 426

(Table), 1996 WL 175369, at *2 (10th Cir. Apr. 15, 1996) (unpublished disposition) (citations omitted). In support of the proposition that amounts charged as a buyer's premium are not property of the estate, the Trustee cites *Remote Operating Systems*. There, a Texas bankruptcy court concluded that a buyer's premium would not become property of the estate because, "based on non-bankruptcy practice, the buyer's premium does not become the seller's property." *Remote Operating Systems*, 238 B.R. at 660. But this Court finds the *Remote Operating Systems'* analysis unpersuasive, and, in any event, the analysis is not helpful to the Trustee here. *Remote Operating Systems* held that when a buyer's premium is to be charged by an auctioneer, the auctioneer must elect at the time of employment to either keep the buyer's premium and charge no additional commission to the estate or, alternatively, to turn over the premium to the estate and seek a full commission from the estate. *Id.* In the cases before this Court, however, Martin Auction seeks to keep the buyer's premiums it collected in undisclosed amounts from each sale and to be awarded a full commission on each sale payable from the respective bankruptcy estates. *Remote Operating Systems* provides no support for that result.

Property of the estate includes the proceeds thereof. 11 U.S.C. §541(a)(1), (6). And "proceeds" has widely been defined simply as the total amount brought in from the sale or disposition of property of the estate. *See, e.g., Rossmiller*, 1996 WL 175369, at *2. That a buyer's premium is added to the highest bid at the closing of the sale does not change the fact that it is part of the total amount received in exchange for the estate property. From the perspective of determining

the gross proceeds of a sale, "[a] 'buyer's premium' is indistinguishable from a direct charge to the estate by the auctioneer for his services." *In re Maropa Marine Sales Service & Storage, Inc.*, 92 B.R. 547, 548 (Bankr. S.D. Fla. 1988). Like a fee charged to the seller by an auctioneer, a fee paid by a purchaser to an auctioneer as part of the consideration given to obtain the debtor's assets does impact the net value realized by the estate and is therefore a commission paid from the estate's proceeds. *See Rossmiller*, 1996 WL 175369, at *2 (citations omitted). To hold otherwise would be to open the door to abuse. *See Carpenter*, 392 B.R. at 104 ("[T]his Court would be loathe to endorse a procedure where money earned from estate proceeds could bypass the estate and go directly into an auctioneer's pocket without being accounted for.").

Because amounts charged as a buyer's premium are property of the estate, such fees must be approved by the court, and that approval must be sought in an application detailing the amounts requested to be paid and the source of payment. Fed. R. Bankr. P. 2016(a). But even if this Court were convinced that amounts charged as a buyer's premium are not property of the estate, those amounts must still be disclosed where, as here, the professional charging the buyer's premium is also seeking approval of compensation from the estate.

Rule 2016(a) requires that fee applications include "a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case [and] the source of the compensation so paid or promised[.]" Fed. R. Bankr. P. 2016(a). And while applications under Rule 2016(a) are only required to be

filed by entities seeking compensation from the estate, the disclosures made within those applications are not explicitly limited to compensation paid or to be paid from the estate. Rather, a plain reading of Rule 2016(a) makes clear that the application must disclose the source of any compensation paid or promised for services rendered in connection with the case. Fed. R. Bankr. P. 2016(a); *In re McDonald Bros. Construction, Inc.*, 114 B.R. 989, 994 n.3 (Bankr. N.D. Ill. 1990). Were Rule 2016 intended only to require disclosure of compensation paid or promised to be paid from the estate, requiring disclosure of the source of such payments would be unnecessary.

This interpretation is entirely consistent with §330, which limits compensation to that which is "reasonable" as determined by the court. 11 U.S.C. §330(a)(1)(A). And although it is compensation from the estate that must be approved by the court, compensation paid or promised from all sources is undeniably relevant to determining the reasonableness of compensation sought from the estate by a professional. *See Driller*, 2004 WL 1661981, at *2, *5; *McDonald Bros. Construction*, 114 B.R. at 994 n.3 (noting that full disclosure of compensation from all sources prevents duplicative compensation). The relevance of payments from all sources is evident from the enumerated factors that courts take into account in determining the reasonableness of compensation to be paid by the estate. In particular, courts generally take into account the time spent and rates charged for services and evaluate whether the services performed were commensurate with the complexity, importance, and nature of the problem, issue, or task addressed. *See* 11 U.S.C. §330(a)(3). But

how could any court effectively consider whether the rates and fees charged are reasonable if the full extent of the compensation has not been disclosed?

Similarly, courts often compare the compensation sought to be approved and the compensation customarily charged by comparably skilled professionals in nonbankruptcy cases. 11 U.S.C. §330(a)(3)(F). Clearly, the disclosure of the total amount of compensation a bankruptcy professional receives from all sources is necessary to accurately determine whether the amount is consistent with the total compensation that would be received outside the context of bankruptcy. Whether the particular compensation sought by a bankruptcy professional is reasonable is a matter for a court to determine. And any effort to determine the reasonableness of compensation necessarily requires the court to consider the professional's entire compensation arrangement, no matter the source of payment. *See Remote Operating Systems*, 238 B.R. at 659-60.

Under any set of circumstances, amounts charged as a buyer's premium must, at the very least, be disclosed in an application for compensation of a professional filed under Rule 2016. But because this Court holds that amounts charged as a buyer's premium are property of the estate, court approval must also be sought. In both cases here, the Trustee, in his Application to Pay, stated that he was "informed that the auctioneer also charged a 'buyer's premium' to the buyer," but he neither disclosed nor asked for approval of the amounts charged. As a result, not only can the buyer's premiums not be approved, but both Applications to Pay must be denied entirely because they lack relevant information necessary for this Court to determine whether any of the

compensation sought is reasonable. *See Park-Helena Corp.*, 63 F.3d at 881-82 ("Even a negligent or inadvertent failure to disclose fully relevant information may result in a denial of all requested fees.").

Finally, it must be noted that the orders authorizing the employment of Martin Auction in both the *Ruffolo* and *THR* cases specifically provided that all fees and expenses were subject to court approval. Martin Auction accepted employment based on an obligation to disclose and seek approval for all compensation it might seek for services rendered to the estate. Its attempt to avoid that obligation in both cases is troubling.

Neither Application to Pay is adequate to allow any compensation to be awarded to Martin Auction at this time. Accordingly, both Applications to Pay must be denied without prejudice.

### IV. Conclusion

The employment and compensation of professionals in bankruptcy is governed by §§327 and 330, and Rules 2014 and 2016. An indispensable part of those procedures is the requirement of full and continuing disclosure of any connections to parties in interest and compensation arrangements from any and all sources. Here, the Trustee and Martin Auction failed to comply with the disclosure requirements, and, as a result, the Applications to Pay in both *THR* and *Ruffolo* are inadequate and cannot be approved.[2]

---

[2] Although not directly before the Court, it appears that the reports of sale filed by the Trustee on behalf of Martin Auction with respect to each sale discussed above are inaccurate. Both reports of sale fail to disclose the amounts collected by Martin Auction for the buyer's premiums and therefore fail to disclose the full price paid for the items sold. *See* Fed. R. Bankr. P. 6004(f)(1). Martin Auction should not expect the

A full discussion of the wisdom and propriety of allowing auctioneers to charge buyer's premiums at bankruptcy sales is beyond the scope of this Opinion. This Court has approved the charging of modest buyer's premiums—5% in *Ruffolo*—when the total commission remains reasonable and customary. But it is not beyond the scope of the Chapter 7 trustees' duties to consider whether the routine charging of buyer's premiums by their auctioneers is wise. Notwithstanding the apparent representations by local auctioneers that the charging of buyer's premiums has no impact on net sales proceeds payable to bankruptcy estates, there is ample commentary to the contrary. *See Driller*, 2004 WL 1661981, at *3-5 (collecting articles). Common sense suggests that savvy buyers will figure the buyer's premium into their bids and experienced sellers will recognize that their net revenues will be impacted by the charge. *Id.* at *4 ("The only sellers that seem to like the buyer's premiums are those that have been erroneously convinced that the premium is not costing them anything." (citation omitted)).

This Opinion resolves only the narrow issue of whether auctioneers must disclose and seek approval to charge buyer's premiums as part of the employment process and must seek final approval of the premiums charged as part of the compensation process. They must. The broader question of whether Chapter 7 trustees should routinely seek approval for auctioneers to make such charges remains open and subject to case-by-case determination. The trustees,

---

approval of any compensation until corrected reports of sale have been filed. In *THR*, the corrected report must disclose details of both the collection and refund of the unauthorized buyer's premium.

as fiduciaries, have a continuing duty to regularly review these issues as they proceed to sell estate assets.[3]

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###

---

[3] This is not to suggest that trustees should always select the least expensive auctioneer. The cheapest is not necessarily the best when hiring professionals. And, as mentioned above, because some auctioneers have a minimum fee and all auctioneers vary in which expenses are included within their commission and which are charged separately, figuring out who is the cheapest may not be easy or obvious. It is to suggest that trustees need to pay attention to these details and not just routinely hire the same auctioneers over and over again despite the doubling or tripling of their commissions without questioning the impact of such charges on estate sales.